UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| DEBRA LEVESKI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-0867-TWP-MJD |
| | ) | |
| ITT EDUCATIONAL SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON PLAINTIFF'S MOTION TO ALTER OR AMEND THE JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59(e)

This matter comes before the Court on Plaintiff Debra Leveski's ("Leveski") Motion to Alter or Amend the Judgment Pursuant to Federal Rule of Civil Procedure 59(e). On July 3, 2007, Leveski filed this lawsuit against Defendant ITT Educational Services, Inc. ("ITT"), alleging that ITT violated the False Claims Act ("FCA") by causing false claims to be presented to the United States for federal educational funds arising under Title IV of the Higher Education Act ("HEA"). On March 17, 2011, ITT filed a Rule 12(b)(1) Motion to Dismiss for lack of subject matter jurisdiction, which the Court granted in an entry dated August 8, 2011 (Dkt. 241). The present motion asks the Court to reconsider and reverse its decision to dismiss this case. For the reasons set forth below, Leveski's motion (Dkt. 255) is **DENIED**.

## I.  BACKGROUND

### A.  General Background on Education Lawsuits Under the FCA

The FCA was enacted to enhance the federal government's ability to recover losses sustained by fraudulent activity perpetrated against it. S. REP. NO. 99-345, at 1-2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266-67.  To effectuate this goal, the FCA "prohibits false

or fraudulent claims for payment to the United States, 31 U.S.C. § 3729(a) ….” *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 (2007). Historically, the FCA's roots can be traced back to the Civil War; it was passed in 1863 in response to private contractors who bilked the federal government by selling it faulty weaponry, rancid food, and old and unseaworthy ships that were repainted and passed off as new. James W. Adams, Jr., *Proof of Violation Under the False Claims Act*, 78 AM. JUR. 3d *Proof of Facts* 357, § 3 (2004).

Specifically, to combat fraud, the FCA imposes civil liability on a party who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" paid by the government. 31 U.S.C. § 3729(a)(1) and (2). From an administrative standpoint, it would be impossible for the government alone to unmask and prosecute all potential FCA violations. *See* S. REP. NO. 99-345, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5267 ("Fraud permeates generally all Government programs ranging from welfare and food stamp benefits, to multibillion dollar defense procurements, to crop subsidies and disaster relief programs."). Accordingly, the statute provides a *qui tam* enforcement mechanism, which allows a private party (i.e., a relator) to bring a lawsuit on behalf of the government and against an entity to recover money the government paid as a result of fraudulent claims. *See* 31. U.S.C. § 3730(b).

The statute incentivizes whistleblowing by allowing relators to keep a share of the proceeds from any judgment or settlement in their cases, as much as 30 percent of the total to which the United States is entitled. *See* 31 U.S.C. § 3730(d)(1) and (2). By offering "private relators bonanzas for valuable information," *United States ex rel. Chovanec v. Apria Healthcare Group*, 606 F.3d 361, 364 (7th Cir. 2010), Congress ensured robust enforcement of the FCA's

goal of rooting out fraud committed against the government. Predictably, however, the promise of such bonanzas can also animate individuals with not-so-valuable information to file *qui tam* suits. To minimize baseless suits, Congress has implemented various hurdles "designed to separate the opportunistic relator from the relator who has genuine, useful information that the government lacks." *In re Natural Gas Royalties Qui Tam Litig.*, 566 F.3d 956, 961 (10th Cir. 2009). These "wheat from the chaff" measures – in particular, the "public disclosure bar" – are discussed in more detail later in this section.

Over the years, numerous FCA claims have been brought in the context of higher education. Due to Eleventh Amendment sovereign immunity, state colleges and universities are immune from *qui tam* liability under the FCA. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 787-88 (2000) (FCA "does not subject a State (or state agency) to liability in such actions."). Moreover, at least one federal court has extended this immunity to community colleges, which are "most often hybrids of state and local entities." *United States ex rel. Diop v. Wayne County Comm. Coll. Dist.*, 242 F. Supp. 2d 497, 526-28 (E.D. Mich. 2003). However, private educational institutions – both for-profit and not-for-profit – do not enjoy this immunity, thus making them susceptible to *qui tam* lawsuits. For-profit institutions, in particular, have been on the receiving end of numerous *qui tam* suits. This is understandable, given that for-profits possess unique characteristics that arguably divorce their productivity from their incentives, potentially encouraging behavior that runs afoul of the HEA. As one commentator has noted, for-profits tend to "cater to the very students that public and private nonprofit institutions often determine are unqualified to attend their institutions, and for-profits are also generally removed from pressures such as institutional rankings." Gayland O. Heathcoat II, *For-Profits Under Fire: The False Claims Act as a Regulatory Check on the For-Profit Education*

*Sector*, 24 LOY. CONSUMER L. REV. 1, 18 (2011) (discussing how not-for-profit private educational institutions do not have the same perverse incentives as their for-profit counterparts).

Indeed, the available data paints an unflattering picture of the for-profit educational sector's performance. The Department of Education's statistics show that although students at for-profits represent only 11 percent of all higher-education students, they represent 26 percent of loan borrowers and 43 percent of loan defaulters. *Id.* at 4 (citing Press Release, U.S. Dep't of Educ., Department of Education Establishes New Student Aid Rules to Protect Borrowers and Taxpayers (Oct. 28, 2010), *available at* http://www.ed.gov/news/press-releases/department-education-establishes-new-student-aid-rules-protect-borrowers-and-tax.)). Taxpayers have every reason to view these default rates as troubling, given that more than 25 percent of for-profits derive 80 percent of their revenues from taxpayer-funded federal financial aid. *Id.* (citation omitted). These figures have compelled many to argue that the for-profit education sector is in dire need of an injection of accountability. *See id.* at 4-5; *see also* Editorial, *An Industry in Need of Accountability*, N.Y. TIMES, Aug. 15, 2011, http://www.nytimes.com/2011/08/16/opinion/an-industry-in-need-of-accountability.html.

The allegations in these FCA lawsuits involving for-profit institutions are often cut from a similar cloth. Before turning to the nature of these allegations, some brief background is instructive. Various forms of federal financial aid are authorized by Title IV of the HEA. *See id.* at 10 (citing Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 (codified as amended in scattered sections of 20 U.S.C.)). In order to be eligible to receive Title IV funding, an educational institution must meet certain requirements and sign a "Program Participation Agreement" ("PPA") with the Secretary of Education. By signing the PPA, the institution makes certain promises and certifications to the federal government. 34 C.F.R. § 668.14.

4

Often, FCA lawsuits involving a for-profit institution allege that the institution has defrauded the government by signing a PPA containing falsities. In FCA parlance, this is known as a "false certification theory," which provides that a claim "can be false where a party merely falsely certifies compliance with a statute or regulation as a condition to government payment." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171 (9th Cir. 2006). Specifically, under the terms of the PPA, educational institutions are barred from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance…." 20 U.S.C. 1094(a)(20) (emphasis added) ("the incentive compensation provision"). Therefore, if an institution pays student recruiters or financial aid administrators based solely on securing enrollment or financial aid (i.e. on a contingency basis "paid by the head"), *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005), then it is breaching the promise it made in the PPA to comply with the incentive compensation provision. *See id.* at 917 ("To prevail in this suit [plaintiff] must establish that the University not only knew… that contingent fees to recruiters are forbidden, but also planned to continue paying those fees while keeping the Department of Education in the dark."). The overarching concern is that educational entities – motivated by profit rather than rankings or other industry benchmarks – have every incentive to maximize enrollment by recruiting unqualified students who will not be able to repay their loans, and the financial consequences of these defaults will trickle down to the detriment of the federal government and its taxpayers. *See id.*; *United States ex rel. Lopez v. Strayer Educ., Inc.*, 698 F. Supp. 2d 633, 635 (E.D. Va. 2010).

5

**B.      Leveski's Lawsuit against ITT**

The present lawsuit tracks this general framework. ITT is a publicly-traded corporation that focuses on technology-oriented programs of study and participates in the federal student financial assistance program. Leveski worked on ITT's Troy, Michigan campus for nearly 11 years. From January 8, 1996 to April 15, 2002, Leveski worked as a student recruiter. Then, from April 15, 2002 to November 3, 2006, she worked as a financial aid administrator. Leveski never worked at ITT's headquarters, was never an ITT manager, and never evaluated ITT employees. In 2005, Leveski brought an unrelated employment suit against ITT. The suit settled and Leveski departed ITT in November 2006. During her employment, Leveski never complained that ITT was in violation of the FCA because of its compensation practices.

In May 2007, a private investigator working for attorney Timothy Matusheski sent Leveski a letter explaining that Matusheski would like to speak with her. Based on his review of public records, Matusheski knew that Leveski was an ex-ITT employee who had filed a lawsuit against her former employer.  For Matusheski, this was not an isolated incident.  To the contrary, Matusheski – whose website domain is www.mississippiwhistleblower.com – has a history of seeking out ex-employees of for-profit educational institutions in hopes of finding an appropriate *qui tam* plaintiff. *See Schultz v. Devry, Inc.*, 2009 WL 562286, at *1 (N.D. Ill. Mar. 4, 2009) ("Schultz did not contemplate bringing a False Claims Act lawsuit against DeVry until attorney Timothy Matusheski telephoned her in May or June 2007."); *Lopez*, 698 F. Supp. 2d at 644 ("In the Court's judgment, Mr. Matusheski actually derived these allegations from a public disclosure."); *United States ex rel. Jones v. Collegiate Funding Servs., Inc.*, 2011 WL 129842, at *10 (E.D. Va. Jan. 12, 2011) (discussing "Mr. Matusheski's a history of recruiting employees who previously filed employment-related lawsuits against lenders and colleges to serve as *qui*

6

*tam* relators in actions based on prior public disclosures"); *United States ex rel. Batiste v. SLM Corp.*, 740 F. Supp. 2d 98, 105 (D.D.C. 2010) (dismissing Matusheski case involving alleged false certification to the Department of Education).

 After Leveski called the private investigator and left a voicemail, she received a call directly from Matusheski. Prior to her conversations with Matusheski, Leveski did not believe that ITT was in violation of the incentive compensation provision; nor had she contemplated bringing an FCA lawsuit against ITT.   (Leveski Dep. 244:14-18; 292:21-24.)  Apparently, though, Leveski's conversations with Matusheski altered her outlook, and she began researching the possibility of a *qui tam* action under the FCA. Specifically, Leveski completed internet research on Title IV funding and reviewed other *qui tam* lawsuits filed against ITT. From there, Leveski came to believe that ITT had violated the incentive compensation provision as it applies to student recruiters and financial aid administrators.  (Leveski Dep. 293:2-17.)

Armed with a newfound perspective on FCA claims, Leveski filed this lawsuit under seal in 2007, alleging that ITT violated the FCA by falsely certifying in its PPA that it was complying with the incentive compensation provision. The Department of Justice declined to intervene in the lawsuit (Dkt. 23), leaving Leveski and her counsel to pursue it in the name of the government. *See* 31 U.S.C. § 3730(b)(4). As discussed above, Leveski's "false certification" claim was not uncharted territory.  *See, e.g., Main*, 426 F.3d 914. In fact, years earlier, ITT was the target of a lawsuit based on similar allegations. *See United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487 (S.D. Tex. 2003).  Notably, Leveski reviewed *Graves* prior to bringing her suit.

**C.     ITT's Motion to Dismiss**

After years of hard-fought litigation, ITT took Leveski's deposition on March 2, 2011

and March 3, 2011. Two weeks later, on March 17, 2011, ITT filed a motion to dismiss under Fed. R. Civ. P. 12(b)(1), arguing that this Court lacks subject matter jurisdiction "because the claims alleged in Leveski's complaint were publicly disclosed before she filed this action and Leveski – as confirmed in her recent deposition – is not the original source of those allegations." (Dkt. 143 at 6). To bolster this argument, ITT highlighted the following facts that came to light during Leveski's deposition:

- Leveski had no intention of bringing an FCA lawsuit before Matusheski and his private investigator contacted her. (Leveski Dep. 244:14-18.)

- Leveski was unable to identify where ITT had promised to comply with the HEA. For instance, Leveski initially testified that, during her time of employment with ITT, she never once saw a PPA. (During the next day of her deposition, she clarified that she did not recall whether she saw a PPA while employed with ITT.) Nor did she know which ITT department handled PPAs. (Leveski Dep: 224:22-24; 270:3-21; 271:8-13.)

- Tellingly, Leveski admitted that her "factual basis for contending that ITT promises to comply with Title IV" came from Matusheski and public materials. For instance, prior to speaking with Matusheski, she had never read Title IV of the HEA. (Leveski Dep: 289:5-21; 467:18-468:4.)

- Leveski testified that the "basis" for her view that ITT was in breach of the incentive compensation provision as it applies to student recruiters came from "talking to [Matusheski] and reading up on the [HEA] and information from the Department of Education." As for the basis for her view that ITT was in breach of the provision as it applies to financial aid administrators, Leveski testified that her "[b]asis was my conversations with [Matusheski], reviewing my annual reviews and looking at information on the HEA Act and on sites from the Department of Education." (Leveski Dep. 388:7-16; 389:5-19.)

- Leveski's complaint contains allegations that are similar to those found in prior lawsuits filed against ITT and other for-profit schools.

According to ITT, the Court lacked subject matter jurisdiction because Leveski lacked even the most rudimentary knowledge about the fundamental premise of her lawsuit.

Indeed, it is worth emphasizing that not just *any* aspiring litigant can come out of the woodwork to bring a *qui tam* action under the FCA. By amending the FCA in 1986 to include a

"public disclosure bar," Congress sought to balance two competing goals: (1) rewarding genuine whistleblowers who possess useful information, (2) without unjustly rewarding parasitic plaintiffs. *See* Tipton F. McCubbins, Tara I. Fitzgerald, *As False Claims Penalties Mount, Defendants Scramble for Answers Qui Tam Liability, 31 U.S.C. § 3729 et seq.*, 62 Bus. Law. 103, 125 (2006); *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396, 1409 (2010) (describing the jurisdictional bar as "[s]eeking the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute on their own") (citation and internal quotations omitted). The first goal ensures that fraud will be uncovered and corruption will be combated; the second prevents unworthy plaintiffs from reaping a windfall by merely parroting secondhand allegations that already reside within the public domain.

In effect, the "public disclosure bar…deprives courts of jurisdiction over *qui tam* suits when the relevant information has already entered the public domain through certain channels," *unless* the relator is the original source of the information. *Graham Cnty.*, 130 S. Ct. at 1401. The statutory basis of the public disclosure bar provides as follows:

> (A) No court shall have jurisdiction over an action under this section <u>based upon the public disclosure of allegations or transactions</u> in a criminal, <u>civil,</u> or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, <u>unless</u> the action is brought by the Attorney General or <u>the person bringing the action is an original source of the information.</u>

> (B) For purposes of this paragraph, "original source" means an individual <u>who has direct and independent knowledge of the information on which the allegations are based</u> and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4) (effective through March 22, 2010; emphasis added).[1]

To determine whether it has subject matter jurisdiction to hear a *qui tam* suit under 31 U.S.C. § 3730(e)(4), a court must undertake a three-step inquiry. *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009). "First, it examines whether the relator's allegations have been 'publicly disclosed.'" *Id.* "If so, it next asks whether the lawsuit is 'based upon' those publicly disclosed allegations." *Id.* "If it is, the court determines whether the relator is an 'original source' of the information upon which his lawsuit is based." *Id.* If the relator is not an original source, the public disclosure bar applies. In its motion to dismiss, ITT argued that the public disclosure bar defeated Leveski's claim. Leveski, of course, vehemently disagreed.

**D.     The Court's Entry Granting ITT's Motion to Dismiss**

On August 8, 2011, this Court granted ITT's Motion to Dismiss (Dkt. 241), ruling that it lacked subject matter jurisdiction over this present action.  *See U.S. ex rel. Leveski v. ITT Educ. Servs., Inc.*, 2011 WL 3471071 (S.D. Ind. Aug. 8, 2011). In doing so, the Court applied the three-prong framework outlined in *Glaser*.

As an initial matter, the Court recognized the Seventh Circuit's approach that "treats the question of whether a lawsuit is 'based upon' a public disclosure as a threshold analysis… intended to be a quick trigger for the more exacting original source analysis." *Glaser*, 570 F.3d at 919-20 (noting that the Supreme Court has suggested that "the main jurisdictional focus is on the 'original source' requirement") (citation and internal quotations omitted). From there, the Court determined that Leveski's allegations arose from information that had been *publicly disclosed*. A public disclosure occurs "when the critical elements exposing the transaction as fraudulent are

---

[1] Signed into law by President Obama on March 23, 2010, the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119, amended the language of 31 U.S.C. § 3730(e)(4), but *Graham Cnty.* concluded that the change is not retroactive. *See* 130 S. Ct. at 1400 n.1. This is the prior version of the statute, since Leveski's lawsuit was filed prior to the amendment.

placed in the public domain." *Id*. at 913 (citation and internal quotations omitted). In its order on the motion to dismiss, the Court found "that public disclosure occurred upon the filing of *Graves*." (Dkt. 241 at 6.)

With respect to the "based upon" prong, the Court determined that Leveski's allegations were *based upon* the *Graves* lawsuit. Importantly, "a lawsuit is *based upon* publicly disclosed allegations when the relator's allegations and the publicly disclosed allegations are *substantially similar*." *Glaser*, 570 F.3d at 915 (emphasis added; citations omitted). Moreover, an FCA action "even partly based upon publicly disclosed allegations or transaction is nonetheless 'based upon' such allegations or transactions." *Id*. at 920-21 (citation and internal quotations omitted). In its order on the motion to dismiss, the Court ruled that *Graves* contained "substantially similar" allegations to Leveski's lawsuit. Specifically, both lawsuits alleged that ITT failed to comply with the incentive compensation provision, thereby breaching promises it made to the federal government in the PPA. *See Graves*, 284 F. Supp. 2d at 499 ("Relators allege that ITT expressly falsely certified in the PPA its agreement to comply with the recruiter compensation provisions of the HEA."). Moreover, Leveski admitted that she reviewed *Graves*, in addition to other publicly available information, before filing her lawsuit.

In making this decision, the Court emphasized that even though the allegations in *Graves* were not identical to those in this lawsuit, its differentiating features – relating to time, place, or manner – were "insufficient to withstand the 'based upon public disclosure' analysis." (Dkt. 241 at 6); *Glaser*, 570 F.3d at 920-21 (the fact that a complaint adds a few allegations covered by a previous disclosure does not take the present case outside the jurisdictional bar, as "based upon" does not mean "solely based upon"). From there, the Court opted not to address whether disclosures of industry-wide abuses in the for-profit education sector suffice for purposes of a

11

public disclosure, since "it has found the requisite public disclosure occurred in the filing of *Graves*." (Dkt. 241 at 7.)

Finally, the Court addressed the "more exacting original source analysis" by determining that Leveski was not the original source of her allegations. *See Glaser*, 570 F.3d at 920. To be an original source where, as here, the relator's allegations are substantially similar to an alleged fraud that has already been publicly disclosed, the relator must have "direct and independent knowledge of the information on which the allegations are based" and must "voluntarily provide[] the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B).

The Court briefly wrestled with this issue. On one hand, Leveski had little, if any, insider knowledge about ITT's compensation and evaluation practices, and had no inkling that ITT was allegedly violating the FCA until she reviewed documents in the public domain after being approached by a private investigator.  On the other hand, Leveski contended that although she was not on the ground-level of the allegedly nefarious compensation scheme, she still had "direct and independent knowledge of the information underlying the incentive compensation provision violation."  (Dkt. 241 at 8.)  In other words, during her 11 years of employment with ITT, Leveski allegedly learned a paramount fact: her boss told her that compensation was "a numbers game," which Leveski inferred to mean that her "compensation was based solely on enrollments." (Leveski Dep. 333:14-24.)

Ultimately, the Court agreed with the nearly on-point case of *Schultz*, 2009 WL 562286, where the district court from the Northern District of Illinois granted defendant's 12(b)(1) motion, highlighting the following as relevant facts: (1) when "Schultz worked for DeVry, she did not have an understanding of Title IV"; (2) Schultz "had not seen a [PPA]" until "Matusheski explained the [PPA] to [her]"; (3) "Shultz did not contemplate bringing a False Claims Act

lawsuit against DeVry until attorney [] Matusheski telephoned her"; and (4) "Schultz learned, in a conversation with Matusheski, that DeVry allegedly violated the [PPA] by compensating recruiters for enrollment." *Id.* at *1; *see also Lopez*, 698 F. Supp. 2d at 638 (dismissing another Matusheski FCA claim against a for-profit institution; "Without any knowledge of the details of [defendant's] representations to the government, [plaintiff] clearly is not the source of the Complaint's allegations that [defendant's] representations to the government were false and made with the requisite intent…. [T]he real source of the information in [plaintiff's] Complaint [was Matusheski.]"). The Court reasoned that, like the plaintiff in *Schultz*, Leveski's knowledge was essentially confined to what she learned from her attorney and what she discovered in the public domain. In sum, the Court found that dismissal was warranted "Because Leveski is not a true whistleblower who gained direct and independent knowledge of the fraud she has alleged while employed at ITT, she does not fall within the original source exception." (Dkt. 241 at 12.)

## E.     The aftermath

Given the hotly contested nature of this dispute, it is not surprising that the parties viewed the Court's ruling from very different perspectives – perhaps even different universes. Leveski responded by arguing that the Court's ruling was so wrong that it warranted a Motion to Amend/Correct Judgment Pursuant to Rule 59(e) (Dkt. 255).   ITT, meanwhile, viewed the Court's ruling as an inevitable and obvious upshot of a frivolous lawsuit, thus compelling it to file a Motion for Attorney's Fees and Sanctions (Dkt. 245).  In light of the Court's decision to grant Leveski's "Motion to Take Proceedings for Defendant's Sanctions Motions and Bill of Costs Off Calendar Until the Court Rules on Relator's Rule 59(e) Motion" (Dkt. 287), this entry only addresses Leveski's Rule 59(e) motion.

## II.  LEGAL STANDARD

Fed. R. Civ. P. 59(e) permits parties to file, within twenty-eight days of the entry of judgment, a motion to alter or amend the judgment. *See* Fed. R. Civ. P. 59(e).  Rule 59 motions for reconsideration "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence."  *Publishers Res., Inc. v. Walker-Davis Publ'n, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985) (citation and internal quotations omitted). "A 'manifest error' is not demonstrated by the disappointment of the losing party"; rather, "[i]t is the wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (citation and internal quotations omitted). Typically, a court will entertain a motion for reconsideration only "when the court has misunderstood a party, where the court has made a decision outside the adversarial issues presented to the court by the parties, where the court has made an error of apprehension (*not reasoning*), where a significant change in the law occurred, or where significant new facts have been discovered." *Nerds on Call, Inc. (Ind.) v. Nerds on Call, Inc. (Cal.)*, 598 F. Supp. 2d 913, 916 (S.D. Ind. 2008) (emphasis added). However, arguments that a court was in error on the issues it already considered should be directed to the court of appeals. *Refrigeration Sales Co., Inc. v. Mitchell-Jackson, Inc.*, 605 F. Supp. 6, 7 (N.D. Ill 1983).

## III.  DISCUSSION

Leveski's Rule 59(e) motion contends that the Court committed two fundamental errors when it granted ITT's motion to dismiss. First, the Court ignored the profound differences between this case and *Graves*. Second, the Court did not apply binding Seventh Circuit precedent, specifically *United States ex rel. Baltazar v. Warden*, 635 F.3d 866 (7th Cir. 2011),

14

which set out a "notice of fraud standard" that applies "to the public disclosure issue." (*See* Dkt. 267 at 16-17.) Each contention is addressed in turn.

**A.   Is reconsideration warranted in light of the Court's treatment of *Graves*?**

In Leveski's view, *Graves* was materially different because it involved a simple, direct, and obvious violation of the incentive compensation provision. This case, by contrast, involves a more elaborate *disguised* violation of the incentive compensation provision, one that pretended to pay recruiters and financial administrators based on an amorphous multi-factor formula, when, in reality, they were paid based solely on numbers.[2] Leveski argues that these cases are so different that *"Graves'* allegations did not publicly disclose the fraud," *"Graves* does not provide the United States with notice that the new scheme is unlawful and fraudulent," and, consequently, the allegations here were not *based upon* the allegations in *Graves*. (*See* Dkt. 256 at 24, 31.)

Through the present motion, Leveski makes brand new arguments and takes old arguments and repackages them in a different form. This "second bite at the apple" approach is fatal to Leveski's motion, as a motion for reconsideration is "not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (citations omitted). Further, if the Court made an error, it was at most one of *reasoning* – not of *apprehension*. *See Nerds on Call*, 598 F. Supp. 2d at 916.

---

[2] This argument was not made in detail in Leveski's response to the 12(b)(1) motion. Instead, Leveski focused most of her attention on the fact that, in *Graves*, the allegations covered a different time period ("while the *Graves* suit may serve as a public disclosure of the specific transactions during the time period…"); a different ITT campus ("While *Graves* may constitute a public disclosure of the particular facts at ITT Santa Clara *between 1993 and 1999*"); and did not cover financial aid advisors ("The misconduct alleged in those exhibits did not concern compensation of recruiters or financial aid advisors."). (Dkt. 154 at 10-12.) Even if this argument is newly-hatched, however, the Court will consider it for the sake of thoroughness (even though it would be well within its discretion to deny it summarily).

That said, even looking at these issues anew, the Court reaches the same result.  First, with respect to the public disclosure analysis, the Court finds that, due to the filing of *Graves*, "disclosures of allegations or transactions revealing the fraud [are] in the public domain." *Baltazar*, 635 F.3d at 867 (7th Cir. 2011).  Leveski's claim is premised on allegations that ITT violated the incentive compensation provision, and, in turn, breached its promise made in the PPA to the federal government. That, too, was the overarching crux of the allegations in *Graves*. Thus, the allegations in *Graves* were adequate to "alert the responsible authority that fraud may be afoot …." *Glaser*, 570 F.3d at 914 (citation and internal quotations omitted).

Next, the Court finds that this suit is *based upon* the *Graves* lawsuit.  To reiterate, whether a relator's allegations are "based upon" a public disclosure depends on whether "the allegations in the *relator's complaint* are *substantially similar* to publicly disclosed allegations." *Id*. at 920 (emphasis added).  Moreover, an FCA action "even partly based upon publicly disclosed allegations or transactions is nonetheless 'based upon' such allegations or transaction." *Id*. at 920-21 (citation and internal quotations omitted).  In its order on the motion to dismiss, the Court squarely rejected Leveski's argument that her case was not based upon *Graves*. In doing so, the Court emphasized that even though the allegations in *Graves* were not identical to those in this lawsuit, its differentiating features – relating to time, place, or manner – were "insufficient to withstand the 'based upon public disclosure' analysis." (Dkt. 241 at 6.) Stated differently, although the lawsuits involved cosmetically different pay schemes, they were both based upon the same particularized fraudulent conduct: the unlawful payment of incentive compensation by ITT to its employees in violation of the incentive compensation provision, which had the effect of breaching the PPA and defrauding the government.  In making this determination, the Court finds that the fraud allegations in *Graves* were more than sufficient to put the government on

16

notice that alleged fraud at ITT was occurring, even if ITT increased the sophistication of its alleged sham compensation scheme over time.   At the very least, Leveski's allegations are "partly based upon" the publicly disclosed allegations in *Graves*.

As part of its "based upon" argument, Leveski maintains that her claims cannot be based upon *Graves* because her claims arose under a "new legal regime." In 2002, a "safe harbor regulation" was promulgated to permit salary adjustments "not based *solely* on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (emphasis added).[3] This safe harbor provision is a component of ITT's defense in this lawsuit. As ITT noted in its Motion to Dismiss Leveski's Second Amended Complaint, "as the Department of Education's regulations make clear, a school may consider a recruiter's success at recruiting students, and even adjust a recruiter's salary based in part upon that success, provided that the amount of any salary adjustment is not based 'solely' upon the number of enrollments that the recruiter obtains." (Dkt. 78 at 18). In other words, ITT claims that its compensation system aligns with the safe harbor provision because it paid student recruiters and financial aid administrators based on an authentic multi-factor evaluation system. Given that the allegations in *Graves* arose *before* the enactment of the safe harbor provision, Leveski argues, they are meaningfully different than her own allegations.

The Court disagrees with Leveski's argument for two reasons. First, the safe harbor was only designed to "clarify" what activity violated the incentive compensation provision. *See* 67 Fed. Reg. 67,048, 67,053 (Nov. 1, 2002) ("rather than being ambiguous, the safe harbors *clarify* the current law for most institutions" and were "[c]onsistent" with the legislative intent behind the incentive compensation provision) (emphasis added). Stated differently, the safe harbor

---

[3] A new version of this regulation became effective on July 1, 2011. The new version eliminates much of the cited language and bars incentive payments "based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid…."

provision was not a tectonic shift in the law like Leveski suggests. Second, and more importantly, this case is not as complex as Leveski makes it out to be. Leveski, like the plaintiff in *Graves*, alleged that ITT violated the incentive compensation provision and, in doing so, breached the PPA and defrauded the government. To reiterate, the fact that ITT allegedly added a layer of complexity to its scheme to pretend to comply with the safe harbor provision does not change this fundamental point.

**B.     Does the holding in *Baltazar* require the Court to reconsider its order?**

As part of its Rule 59(e) motion, Leveski also argues that the Seventh Circuit's recent decision in *Baltazar*, 635 F.3d 866, is a game-changer because it clarifies that the "based upon public disclosure" standard relates to whether the government is put on notice of the fraud. This argument is somewhat curious, given that the Court has never questioned that a disclosure must "be sufficient to put the government on notice of the likelihood of fraudulent activity." *Lopez*, 698 F. Supp. 2d at 641 (quoting *Gilligan v. Medtronic, Inc.*, 403 F.3d 386, 389 (6th Cir. 2005)). In the Court's view, the allegations in *Graves* would easily put the government on the scent of ongoing fraud at ITT involving false certifications in its PPAs (even if, over time, ITT added a layer of complexity to its alleged compensation scheme).

Moreover, the Court finds that Leveski has overstated the impact of *Baltazar*. In *Baltazar*, a chiropractor filed a *qui tam* FCA lawsuit against her former employer alleging that it had submitted fraudulent bills to Medicare and Medicaid. 635 F.3d at 866. Prior to her lawsuit, the plaintiff had done "a little digging" and learned that this practice had become the norm at her firm pursuant to the instructions of the firm's owner. *Id.* at 867. The defendant argued that the plaintiff's claim was barred because it was based upon publicly disclosed governmental reports – issued in 1987, 2000, and 2005 – chronicling the pervasiveness of Medicare and Medicaid fraud

18

in the chiropractic industry. *Id*. For instance, the 2005 report concluded that 57 percent of chiropractors' claims (in a sample of 400) were for services not covered by the Medicare program, and another 16 percent were for covered services that had been miscoded. *Id*. Importantly, though, these reports related to chiropractic services *as a whole*; they did not attribute fraud to *individual* firms. Nonetheless, given the ubiquity of the fraud in the industry, the district judge reasoned that the relator should not be given "a piece of the action" because she was not the original source of the disclosures. *Id*.

In an opinion written by Judge Easterbrook, the Seventh Circuit reversed. In doing so, the court highlighted that although the reports pertained to a large number of players in the chiropractic industry, they did not specifically mention the defendant. On this point, the court clarified that a "statement such as 'half of all chiropractors' claims are bogus' does not reveal which *half* and therefore does not permit suit against any particular medical provider." *Id*. Along similar lines, the Court recognized that reports documenting the prevalence of fraud in a given industry – "without attributing fraud to particular firms" – do not prevent *qui tam* suits against a particular member of the industry. *Id*. at 868. In fleshing out the meaning of the public disclosure bar, Judge Easterbrook analogized the requisite public disclosure to the triggering point for a statute of limitations, writing that "only information that a *particular* provider had committed a *particular* fraud" would start the clock on a limitations period for a suit by the United States. *Id*. Logically following, "[i]f it takes specific information to start the period of limitations, it also takes specific information to conclude that a suit against a particular provider was 'based upon' the public report, rather than based on other information about the provider." *Id*.

Leveski insists that the Court's decision granting the motion to dismiss cannot be squared with *Baltazar*. The Court is not persuaded. *Baltazar* merely emphasized the need for the public

disclosure to contain information that would give rise to the inference that a *particular* entity committed a *particular* fraud. Here, *Graves* did just that, providing information that ITT (a particular entity) committed fraud by violating the incentive compensation provision (a particular fraud), thus breaching promises made to the government in the PPA. While the mechanics of this scheme are perhaps not identical to the mechanics of the scheme alleged in *Graves*, the two cases need not be identical. Pursuant to *Glaser*, substantial similarity is all that is required, notwithstanding the addition of "a few allegations." *Glaser*, 570 F.3d at 915; *see also United States ex rel. Boothe v. Sun Healthcare Group., Inc.*, 496 F.3d 1169, 1174 (10th Cir. 2007) ("Not a single circuit has held that a *complete* identity of allegations, even as to time, place, and manner is required to implicate the public disclosure bar; rather, all have held, at a minimum, that dismissal is warranted where the plaintiff seeks to pursue a claim, the essence of which is 'derived from' a prior public disclosure."); *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 514-15 (6th Cir. 2009) (finding allegations to be publicly disclosed despite the addition of "new details concerning [defendant's] illegal kickback scheme" because there was a "substantial likeness" between the relator's allegations and the publicly disclosed allegations).

Finally, it is worth reemphasizing that the Court's decision to grant ITT's motion to dismiss was not an anomaly. To the contrary, other courts have dismissed nearly identical *qui tam* suits where the plaintiff's attorney clearly recruited the relators to serve as makeshift and manufactured whistleblowers wielding generic and cookie-cutter complaints. Notably, in *Lopez*, the court recognized the uncanny resemblance between the complaint filed in that case with the one filed in the present matter. *See Lopez*, 698 F. Supp. 2d at 643 ("A side-by-side comparison of the complaint filed in the *Leveski* case and the present Complaint reveals that fifty-one of the fifty-eight paragraphs falling under the 'Facts' section of Lopez's Complaint repeat, almost

entirely word-for-word, the *Leveski* Complaint…. This similarity is more than coincidental. [Matusheski] clearly obtained this information from a source other than his client's experience as [defendant's] employee."); *see also Jones*, 2011 WL 129842; *Schultz*, 2009 WL 562286; *Batiste*, 740 F. Supp. 2d 98. Tellingly, in *Lopez*, Matusheski apologized for his behavior to the defendant, the court, and the Department of Justice. (Dkt. 143-3.) At oral arguments on this motion, in a move that was as ironic as it was brazen, counsel for Leveski described the *Lopez* decision as the product of a "dead wrong" judicial mistake, but then softened the criticism with the assurance that "[w]e're all fallible." (Dkt. 185 at 29.).

## IV.   CONCLUSION

Given the exacting standard for a motion to reconsider, the substantial similarity between this case and *Graves*, the existence of nearly on-point cases reaching identical results, the attorney-driven nature of this lawsuit, and the distinguishing features of *Baltazar*, the Court denies Leveski's motion. In sum, although a relator need not have direct and independent knowledge of every detail or element of her complaint, the Court finds that Leveski is worlds apart from the type of genuine whistleblower contemplated by the FCA. On this point, it is worth, once again, emphasizing certain telling portions of Leveski's deposition:

> Q.   Ms. Leveski, you developed an understanding in 2007 that ITT's compensation of student recruiters was inconsistent with the incentive compensation regulation; correct?
>
> A.   Correct.
>
> Q.   What was the basis for you forming that understanding in 2007?
>
> A.   Basis included talking to [Matusheski] and reading up on the Act and information from the Department of Education.
>
> . . . .

21

Q.    What's your factual basis for contending that ITT promises to comply with Title IV of the [HEA]?

A.    That information was given to me from Tim Matusheski.

Q.    And do you have any information regarding that contention apart from your conversations with [Matusheski] or your other attorneys?

A.    I've probably viewed things on Websites and things like that, Department of Education searches, but I don't retain it all in memory because it's too much.

(Leveski Dep. 388:7-16; 467:18-477:4.)

Leveski's Motion to Alter or Amend the Judgment Pursuant to Fed. R. Civ. P. 59(e) (Dkt. 255) is **DENIED**. The existing stay (Dkt. 287) is lifted. The Court will address the pending motions pertaining to attorney's fees and the bill of costs (Dkt. 244 and Dkt. 245) – which have been fully briefed – in due course.

SO ORDERED.   1/30/2012

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kristopher P. Diulio
GIBSON DUNN & CRUTCHER LLP
kdiulio@gibsondunn.com, gross@gibsondunn.com

Frederick D. Emhardt
PLEWS SHADLEY RACHER & BRAUN
emhardt@psrb.com, akeaton@psrb.com

Nicola T. Hanna
GIBSON DUNN & CRUTCHER LLP
NHanna@gibsondunn.com, TStephens@gibsondunn.com

Timothy John Hatch
GIBSON DUNN & CRUTCHER LLP
thatch@gibsondunn.com

Sean M. Hirschten
PLEWS SHADLEY RACHER & BRAUN
shirschten@psrb.com, sehirschten@gmail.com

John M. Ketcham
PLEWS SHADLEY RACHER & BRAUN
jketcham@psrb.com, rtreesh@psrb.com

Mark I. Labaton
MOTLEY RICE LLP
mlabaton@motleyrice.com, kmontenegro@motleyrice.com

Timothy J. Matusheski
LAW OFFICES OF TIMOTHY J. MATUSHESKI
tim@mississippiwhistleblower.com, timmatu@yahoo.com

Brianna J. Schroeder
PLEWS SHADLEY RACHER & BRAUN
bschroeder@psrb.com, jbowman@psrb.com

Wayne W. Smith
GIBSON DUNN & CRUTCHER, LLP
wsmith@gibsondunn.com, gross@gibsondunn.com, dfkennedy@gibsondunn.com

Philip A. Whistler
ICE MILLER LLP
philip.whistler@icemiller.com, marti.westerfield@icemiller.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov, melanie.crouch@usdoj.gov

Robert M. Zabb
MOTLEY RICE LLP
rzabb@motleyrice.com, kmontenegro@motleyrice.com

James L. Zelenay, Jr.
GIBSON DUNN & CRUTCHER LLP
jzelenay@gibsondunn.com