UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

UNITED STATES OF AMERICA,      )
DEBRA LEVESKI,                 )
                               )
        Plaintiffs,            )
                               )
    v.                         )        Case No. 1:07-cv-0867-TWP-MJD
                               )
ITT EDUCATIONAL SERVICES, INC.,)
                               )
        Defendant.             )

**ENTRY ON DEFENDANT'S MOTION FOR ATTORNEY'S FEES AND SANCTIONS**

This matter comes before the Court on Defendant ITT Educational Services, Inc.'s

("ITT") Motion for Attorney's Fees and Sanctions (Dkt. 245). On July 3, 2007, Plaintiff Debra

Leveski ("Leveski") filed this lawsuit against ITT, alleging that ITT violated the False Claims

Act ("FCA") by causing false claims to be presented to the United States for federal educational

funds arising under Title IV of the Higher Education Act ("HEA"). On April 8, 2011, the Court

ruled that it lacked subject matter jurisdiction over this dispute because the FCA's "public

disclosure bar" applied: that is, the allegations in Leveski's complaint were publicly disclosed

before she filed this action, and she was not the original source of those allegations. (Dkt. 241);

*see* 31 U.S.C. § 3730(e)(4) (effective through March 22, 2010).[1]

The parties viewed the Court's ruling from different vantage points, perhaps even

different universes. Leveski responded by arguing that the Court's ruling was so wrong that it

warranted a Motion to Amend/Correct Judgment Pursuant to Rule 59(e) (Dkt. 255). ITT,

---

[1] Signed into law by President Obama on March 23, 2010, the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119, amended the language of 31 U.S.C. § 3730(e)(4), but *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396 (2010) concluded that the change is not retroactive. *See* 130 S. Ct. at 1400 n.1. Thus, the prior version of the statute applies to the present dispute.

meanwhile, viewed the Court's ruling as an inevitable and obvious upshot of a frivolous lawsuit, thus compelling it to file a Motion for Attorney's Fees and Sanctions (Dkt. 245). On January 30, 2012, the Court denied Leveski's Rule 59(e) motion (Dkt. 297), thus paving the way for the Court to rule on ITT's motion pertaining to attorney's fees and sanctions. For the reasons set forth below, ITT's Motion for Attorney's Fees and Sanctions (Dkt. 245) is **GRANTED** in the amount of $394,998.33 against Timothy J. Matusheski individually, The Law Offices of Timothy J. Matusheski, the law firm of Plews Shadley Racher & Braun, and the law firm of Motley Rice LLP.

# I.       BACKGROUND[2]

## A.  General Background on Education Lawsuits Under the FCA

The FCA was enacted to enhance the federal government's ability to recover losses sustained by fraudulent activity perpetrated against it. S. REP. NO. 99-345, at 1-2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266-67. To effectuate this goal, the FCA "prohibits false or fraudulent claims for payment to the United States, 31 U.S.C. § 3729(a) . . . ." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 (2007). Historically, the FCA's roots can be traced back to the Civil War; it was passed in 1863 in response to private contractors who bilked the federal government by selling it faulty weaponry, rancid food, and old and unseaworthy ships that were repainted and passed off as new. James W. Adams, Jr., *Proof of Violation Under the False Claims Act*, 78 AM. JUR. 3d *Proof of Facts* 357, § 3 (2004).

Specifically, to combat fraud, the FCA imposes civil liability on a party who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or

---

[2] Parts of the background section should look familiar to the parties. In drafting this section, the Court borrowed heavily from the background section of its order on Leveski's Rule 59(e) motion (Dkt. 297).

"knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" paid by the government. 31 U.S.C. § 3729(a)(1) and (2). From an administrative standpoint, it would be impossible for the government alone to unmask and prosecute all potential FCA violations. *See* S. REP. NO. 99-345, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5267 ("Fraud permeates generally all Government programs ranging from welfare and food stamp benefits, to multibillion dollar defense procurements, to crop subsidies and disaster relief programs."). Accordingly, the statute provides a *qui tam* enforcement mechanism, which allows a private party (i.e. a relator) to bring a lawsuit on behalf of the government and against an entity placing fraudulent claims for payment. *See* 31. U.S.C. § 3730(b).

The statute incentivizes whistleblowing by allowing relators to keep a share of the proceeds from any judgment or settlement in their cases, as much as 30 percent of the total to which the United States is entitled. *See* 31 U.S.C. § 3730(d)(1) and (2). By offering "private relators bonanzas for valuable information," *United States ex rel. Chovanec v. Apria Healthcare Group*, 606 F.3d 361, 364 (7th Cir. 2010), Congress ensured robust enforcement of the FCA's goal of rooting out fraud committed against the government. Predictably, however, the promise of such bonanzas can also animate individuals with not-so-valuable information to file *qui tam* suits. To minimize baseless suits, Congress has implemented various hurdles "designed to separate the opportunistic relator from the relator who has genuine, useful information that the government lacks." *In re Natural Gas Royalties Qui Tam Litig.*, 566 F.3d 956, 961 (10th Cir. 2009). These "wheat from the chaff" measures—in particular, the "public disclosure bar"—are discussed in more detail later in this section.

3

Over the years, numerous FCA claims have been brought in the context of higher education. Due to Eleventh Amendment sovereign immunity, state colleges and universities are immune from *qui tam* liability under the FCA. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 787-88 (2000) (FCA "does not subject a State (or state agency) to liability in such actions."). Moreover, at least one federal court has extended this immunity to community colleges, which are "most often hybrids of state and local entities." *United States ex rel. Diop v. Wayne County Comm. Coll. Dist.*, 242 F. Supp. 2d 497, 526-28 (E.D. Mich. 2003). However, private educational institutions—both for-profit and not-for-profit—do not enjoy this immunity, thus making them susceptible to *qui tam* lawsuits.

For-profit institutions, in particular, have been on the receiving end of numerous *qui tam* suits. This is understandable, given that for-profits possess unique characteristics that arguably divorce their productivity from their incentives, potentially encouraging behavior that runs afoul of the HEA. As one commentator has noted, for-profits tend to "cater to the very students that public and private nonprofit institutions often determine are unqualified to attend their institutions, and for-profits are also generally removed from pressures such as institutional rankings." Gayland O. Heathcoat II, *For-Profits Under Fire: The False Claims Act as a Regulatory Check on the For-Profit Education Sector*, 24 Loy. Consumer L. Rev. 1, 18 (2011) (discussing how not-for-profit private educational institutions do not have the same perverse incentives as their for-profit counterparts).

Indeed, the available data paints an unflattering picture of the for-profit educational sector's performance. The Department of Education's statistics show that although students at for-profits represent only 11 percent of all higher-education students, they represent 26 percent of loan borrowers and 43 percent of loan defaulters. *Id.* at 4 (citing Press Release, U.S. Dep't of

Educ., Department of Education Establishes New Student Aid Rules to Protect Borrowers and Taxpayers (Oct. 28, 2010), *available at* http://www.ed.gov/news/press-releases/department-education-establishes-new-student-aid-rules-protect-borrowers-and-tax.)). Taxpayers have every reason to view these default rates as troubling, given that more than 25 percent of for-profits derive 80 percent of their revenues from taxpayer-funded federal financial aid. *Id.* (citation omitted). These figures have compelled many to argue that the for-profit education sector is in dire need of an injection of accountability. *See id.* at 4-5; *see also* Editorial, *An Industry in Need of Accountability*, N.Y. TIMES, Aug. 15, 2011, http://www.nytimes.com/2011/08/16/opinion/an-industry-in-need-of-accountability.html.

The allegations in these FCA lawsuits involving for-profit institutions are often cut from a similar cloth. Before turning to the nature of these allegations, some brief background is instructive. Various forms of federal financial aid are authorized by Title IV of the HEA. *See id.* at 10 (citing Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 (codified as amended in scattered sections of 20 U.S.C.)). In order to be eligible to receive Title IV funding, an educational institution must meet certain requirements and sign a "Program Participation Agreement" ("PPA") with the Secretary of Education. By signing the PPA, the institution makes certain promises and certifications to the federal government. 34 C.F.R. § 668.14.

Often, FCA lawsuits involving a for-profit institution allege that the institution has defrauded the government by signing a PPA containing falsities. In FCA parlance, this is known as a "false certification theory," which provides that a claim "can be false where a party merely falsely certifies compliance with a statute or regulation as a condition to government payment." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171 (9th Cir. 2006). Specifically, under the terms of the PPA, educational institutions are barred from "provid[ing]

any commission, bonus, or other incentive payment <u>based directly or indirectly on success in</u> <u>securing enrollments or financial aid to any persons or entities engaged in any student recruiting</u> <u>or admission activities or in making decisions regarding the award of student financial assistance</u> . . . ." 20 U.S.C. 1094(a)(20) (emphasis added) ("the incentive compensation provision").

Therefore, if an institution pays student recruiters or financial aid administrators based solely on securing enrollment or financial aid (i.e. on a contingency basis "paid by the head"), *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005), then it is breaching the promise it made in the PPA to comply with the incentive compensation provision. *See id.* at 917 ("To prevail in this suit [plaintiff] must establish that the University not only knew . . . that contingent fees to recruiters are forbidden, but also planned to continue paying those fees while keeping the Department of Education in the dark."). The overarching concern is that educational entities—motivated by profit rather than rankings or other industry benchmarks— have every incentive to maximize enrollment by recruiting unqualified students who will not be able to repay their loans, and the financial consequences of these defaults will trickle down to the detriment of the federal government and its taxpayers. *See id.*

**B. Leveski's Lawsuit against ITT**

The present lawsuit tracked this general framework. ITT is a publicly-traded corporation that focuses on technology-oriented programs of study and participates in the federal student financial assistance program. Leveski worked on ITT's Troy, Michigan campus for nearly 11 years. From January 8, 1996 to April 15, 2002, Leveski worked as a student recruiter. Then, from April 15, 2002 to November 3, 2006, she worked as a financial aid administrator. Leveski never worked at ITT's headquarters, was never an ITT manager, and never evaluated ITT employees. In 2005, Leveski brought an unrelated employment suit against ITT. The suit settled and Leveski

departed ITT in November 2006. During her employment, Leveski never complained that ITT

was in violation of the FCA because of its compensation practices.

In May 2007, a private investigator working for attorney Timothy Matusheski sent

Leveski a letter explaining that Matusheski would like to speak with her. Based on his review of

public records, Matusheski knew that Leveski was an ex-ITT employee who had filed a lawsuit

against her former employer. For Matusheski, this was not an isolated incident. To the contrary,

Matusheski (whose website domain is www.mississippiwhistleblower.com (last visited March

15, 2012)) advertises for clients who "work or worked in the financial aid or recruitment

department for an institution of higher education" and has a history of seeking out ex-employees

of for-profit educational institutions in hopes of finding an appropriate *qui tam* plaintiff.

Actually, it is unclear if Matusheski cares whether the prospective plaintiff is *appropriate* in the

sense that he or she has valuable information. From what the Court can gather, Matusheski's

view is that virtually *any* ex-employee will do for purposes of manufacturing an FCA lawsuit.

*See Schultz v. DeVry, Inc.*, 2009 WL 562286, at *1 (N.D. Ill. Mar. 4, 2009) ("Schultz did not

contemplate bringing a False Claims Act lawsuit against DeVry until attorney Timothy

Matusheski telephoned her in May or June 2007."); *United States ex rel. Lopez v. Strayer Educ.,

Inc.*, 698 F. Supp. 2d 633, 644 (E.D. Va. 2010) ("In the Court's judgment, Mr. Matusheski

actually derived these allegations from a public disclosure."); *United States ex rel. Jones v.

Collegiate Funding Servs., Inc.*, 2011 WL 129842, at *10 (E.D. Va. Jan. 12, 2011) (discussing

"Mr. Matusheski's history of recruiting employees who previously filed employment-related

lawsuits against lenders and colleges to serve as *qui tam* relators in actions based on prior public

disclosures"); *United States ex rel. Batiste v. SLM Corp.*, 740 F. Supp. 2d 98, 105 (D.D.C. 2010)

(dismissing Matusheski case involving alleged false certification to the Department of Education).

After Leveski returned the private investigators telephone call and left a voicemail, she received a call directly from Matusheski. Prior to her conversations with Matusheski, Leveski did not believe that ITT was in violation of the incentive compensation provision; nor had she ever contemplated bringing an FCA lawsuit against ITT. (Leveski Dep. 244:14-18; 292:21-24). Apparently, though, the enlightening conversation with Matusheski altered Leveski's outlook, and she began researching the possibility of a *qui tam* action under the FCA. Specifically, Leveski conducted internet research on Title IV funding and reviewed other *qui tam* lawsuits filed against ITT. From there, Leveski came to believe that ITT had violated the incentive compensation provision as it applies to student recruiters and financial aid administrators. (Leveski Dep. 293:2-17).

Armed with a newfound perspective on FCA claims, Leveski filed this lawsuit under seal on July 3, 2007, alleging that ITT violated the FCA by falsely certifying in its PPA that it was complying with the incentive compensation provision. The Department of Justice declined to intervene in the lawsuit (Dkt. 23), leaving Leveski and her counsel to pursue it in the name of the government. *See* 31 U.S.C. § 3730(b)(4). As discussed above, Leveski's "false certification" claim was not uncharted territory. *See, e.g., Main*, 426 F.3d 914. In fact, years earlier, ITT was the target of a lawsuit based on similar allegations. *See United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487 (S.D. Tex. 2003), *affirmed* 111 Fed. Appx. 296 (5th Cir. 2004). Importantly, Leveski reviewed *Graves* prior to bringing her suit.

**C.  The District Courts' Decisions in *Shultz* and *Lopez***

While Leveski pursued this lawsuit against ITT, two district courts issued opinions

dismissing very similar Matusheski-led cases against for-profit educational institutions. *See*

*Schultz*, 2009 WL 562286; *Lopez*, 698 F. Supp. 2d 633. A prominent theme of ITT's present

motion is that, in the wake of these rulings, Leveski's counsel should have immediately

recognized that her claim was destined to fail and voluntarily dismissed this case.

Specifically, on March 4, 2009, Judge Conlon of the Northern District of Illinois granted

the defendant's motion to dismiss in *Schultz*. Since that date, ITT has incurred $4,700,051.75 in

total fees in this case. (Dkt. 246-1). A year later, on March 18, 2010, Judge O'Grady of the

Eastern District of Virginia granted a motion to dismiss in another Matusheski case. *See Lopez*,

698 F. Supp. 2d 633. On May 4, 2010, with the specter of attorney's fees hanging over his head

(Dkt. 246-6), Matusheski—in consultation with his client, who was fearful of the potentially

devastating financial impact of an attorney's fees award (Dkt. 270-2)—apologized to the court,

the Department of Justice, and the Defendant. The apology read as follows:

> Counsel for Magdalis Lopez accepts the decision and findings of
> the Court in *Lopez v. Strayer Education, Inc.* . . . . Mr. Timothy
> Matusheski and The Law Offices of Timothy J. Matusheski, PLLC
> apologize for the harm to Strayer University and regret the expense
> and effort incurred by the United States Department of Justice and
> the Court because of this litigation.

(Dkt. 246-7). After the apology, the defendant withdrew the motion for attorney's fees. Since the

date of the apology, ITT has incurred $4,559,674.25 in total fees in this case. (Dkt. 246-1).

Undeterred by this course of events, Matusheski and local counsel pressed on with the present

lawsuit.

**D.  Discovery**

The parties conducted extensive discovery in this case. On September 1, 2010 and

February 8, 2011, Leveski served on ITT broad discovery requests for production of documents—pertaining to all of ITT's 130 campuses, not just the Troy, Michigan campus where Leveski worked. Ultimately, a meet and confer led to a resolution: "ITT agreed to provide certain information in exchange for Leveski's agreement not to seek nationwide discovery." (Dkt. 246 at 13).

After years of hard-fought litigation,[3] ITT took Leveski's deposition on March 2 and 3, 2011. During the deposition, numerous significant facts came to light, including:

- Leveski had no intention of bringing an FCA lawsuit before Matusheski and his private investigator contacted her. (Leveski Dep. 244:14-18).

- Leveski was unable to identify where ITT had promised to comply with the HEA. For instance, Leveski initially testified that, during her time of employment with ITT, she never once saw a PPA. (During the next day of her deposition, she clarified that she did not recall whether she saw a PPA while employed with ITT.) Nor did she know which ITT department handled PPAs. (Leveski Dep: 224:22-24; 270:3-21; 271:8-13).

- Tellingly, Leveski admitted that her "factual basis for contending that ITT promises to comply with Title IV" came from Matusheski and public materials. For instance, prior to speaking with Matusheski, she had never read Title IV of the HEA. (Leveski Dep: 289:5-21; 467:18-468:4).

- Leveski testified that the "basis" for her view that ITT was in breach of the incentive compensation provision as it applies to student recruiters came from "talking to [Matusheski] and reading up on the [HEA] and information from the Department of Education." As for the basis for her view that ITT was in breach of the provision as it applies to financial aid administrators, Leveski testified that her "[b]asis was my conversations with [Matusheski], reviewing my annual reviews and looking at information on the HEA Act and on sites from the Department of Education." (Leveski Dep. 388:7-16; 389:5-19).

Based on these revelations (which ITT considered fatal to Leveski's case), ITT issued Leveski an ultimatum in a letter dated March 7, 2011: voluntarily dismiss the suit or ITT will "seek to recover its fees and expenses from Ms. Leveski, the bankruptcy trustee, and her counsel

---

[3] Notably, Leveski survived a motion to dismiss (Dkt. 92) before succumbing to ITT's 12(b)(1) motion based on lack of subject matter jurisdiction.

. . . that has continued to pursue this case with clear knowledge that Ms. Leveski lacks

standing[.]" On this point, ITT emphasized that it had incurred significant expenses in defending

this matter to date and that it would continue to do so until it prevailed or Leveski dropped her

lawsuit, adding that "it is unreasonable and vexatious for Ms. Leveski and her counsel to

continue with this frivolous lawsuit in light of Ms. Leveski's clear testimony regarding Mr.

Matusheski's role in recruiting her and informing her of the bases of her lawsuit . . . ." (Dkt. 246-

3).  Despite another warning, Leveski forged ahead with the lawsuit.

On March 17, 2011, as discussed in detail below, ITT filed a motion to dismiss under

Fed. R. Civ. P. 12(b)(1). Months later, the Court found this motion to be dispositive. But, in the

meantime, counsel for Leveski litigated the case aggressively, filing various motions and pushing

for additional discovery. Specifically, between the time ITT filed its Rule 12(b)(1) Motion to

Dismiss and the Court's entry granting that motion, Leveski filed the following opposed motions

(in addition to several unopposed motions): (1) Motion for Continuance of MSJ Briefing (Dkt.

178); (2) Motion to Strike ITT's Advice of Counsel Defense or Order Additional Discovery

(Dkt. 179); (3) Motion to Compel Production of Evaluation and Compensation Charts (Dkt.

201); and (4) Appeal of Magistrate Judge Dinsmore's July 6, 2011 Ruling on Motion to Strike

Advice of Counsel Defense (Dkt. 215). From March 7, 2011 (the date of the initial letter asking

Leveski to drop her lawsuit) through August 8, 2011 (the day the Court granted Leveski's

12(b)(1) motion), ITT incurred $2,633,322.25 in total fees in this case. (Dkt. 246-1).

**E.  ITT's Motion to Dismiss**

On March 17, 2011, ITT filed a 12(b)(1) motion to dismiss, arguing that this Court lacks

subject matter jurisdiction "because the claims alleged in Leveski's complaint were publicly

disclosed before she filed this action and Leveski—as confirmed in her recent deposition—is not

the original source of those allegations." (Dkt. 143 at 6). To bolster this argument, ITT

highlighted the numerous deposition excerpts, cited above, that displayed Levenski's dearth of

firsthand knowledge about the most basic allegations of this case.

Indeed, it is worth emphasizing that not just *any* aspiring litigant can come out of the

woodwork to bring a *qui tam* action under the FCA. By amending the FCA in 1986 to include a

"public disclosure bar," Congress sought to balance two competing goals: (1) rewarding genuine

whistleblowers who possess useful information, (2) without unjustly rewarding parasitic

plaintiffs. *See* Tipton F. McCubbins, Tara I. Fitzgerald, *As False Claims Penalties Mount,*

*Defendants Scramble for Answers Qui Tam Liability, 31 U.S.C. § 3729 et seq.*, 62 BUS. LAW.

103, 125 (2006); *Graham Cnty.*, 130 S. Ct. at 1409 (describing the jurisdictional bar as

"[s]eeking the golden mean between adequate incentives for whistle-blowing insiders with

genuinely valuable information and discouragement of opportunistic plaintiffs who have no

significant information to contribute on their own") (citation and internal quotations omitted).

The first goal ensures that fraud will be uncovered and corruption will be combated; the second

prevents unworthy plaintiffs from reaping a windfall by merely parroting secondhand allegations

that already reside within the public domain.

In effect, the "public disclosure bar . . . deprives courts of jurisdiction over *qui tam* suits

when the relevant information has already entered the public domain through certain channels,"

*unless* the relator is the original source of the information. *Graham Cnty.*, 130 S. Ct. at 1401. The

statutory basis of the public disclosure bar provides as follows:

> (A) No court shall have jurisdiction over an action under this
> section based upon the public disclosure of allegations or
> transactions in a criminal, civil, or administrative hearing, in a
> congressional, administrative, or Government Accounting
> Office report, hearing, audit, or investigation, or from the news

media, <u>unless</u> the action is brought by the Attorney General or <u>the person bringing the action is an original source of the information</u>.

(B) For purposes of this paragraph, "original source" means an individual <u>who has direct and independent knowledge of the information on which the allegations are based</u> and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4) (effective through March 22, 2010; emphasis added).[4]

To determine whether it has subject matter jurisdiction to hear a *qui tam* suit under 31 U.S.C. § 3730(e)(4), a court must undertake a three-step inquiry. *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009). "First, it examines whether the relator's allegations have been 'publicly disclosed.'" *Id.* "If so, it next asks whether lawsuit is 'based upon' those publicly disclosed allegations." *Id.* "If it is, the court determines whether the relator is an 'original source' of the information upon which his lawsuit is based." *Id.* If the relator is not an original source, the public disclosure bar applies. In its motion to dismiss, ITT argued that the public disclosure bar defeated Leveski's claim. Leveski, of course, vehemently disagreed.

### F. The Court's Entries (1) Granting ITT's Motion to Dismiss, and (2) Denying Leveski's Rule 59(e) Motion

On August 8, 2011, the Court granted ITT's Motion to Dismiss (Dkt. 241), ruling that it lacked subject matter jurisdiction over this present action. *See United States ex rel. Leveski v. ITT Educ. Servs., Inc.*, 2011 WL 3471071 (S.D. Ind. Aug. 8, 2011). In doing so, the Court applied the three-prong framework outlined in *Glaser*. With relative ease, the Court found that the present lawsuit was based upon a public disclosure—specifically, the filing of the *Graves* lawsuit. (Dkt. 241 at 6-7). From there, the Court turned to the more exacting "original source" analysis.

---

[4] For the reason described in footnote 1 above, this is the prior version of the statute. *See Graham Cnty.*, 130 S. Ct. at 1400 n.1.

The Court briefly wrestled with this issue. On one hand, Leveski had no inkling that ITT was allegedly violating the FCA until she reviewed documents in the public domain after being approached by a private investigator. On the other hand, Leveski contended that although she was not on the ground-level of the allegedly nefarious compensation scheme, she still had "direct and independent knowledge of the information underlying the incentive compensation provision violation." (Dkt. 241 at 8). In other words, during her 11 years of employment with ITT, Leveski allegedly learned a paramount fact: her boss told her that compensation was "a numbers game," which Leveski inferred to mean that her "compensation was based solely on enrollments." (Leveski Dep. 333:14-24). In the end, the Court, relying on nearly on-point authority (i.e. the *Schultz* case), found that "[b]ecause Leveski is not a true whistleblower who gained direct and independent knowledge of the fraud she has alleged while employed at ITT, she does not fall within the original source exception." (Dkt. 241 at 12). Accordingly, the Court granted ITT's 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. 255).

In lieu of appealing the Court's ruling, Leveski responded by filing a Rule 59(e) motion, asking the Court to reconsider and reverse its ruling on ITT's 12(b)(1) Motion to Dismiss (Dkt. 255). Leveski's motion contended that the Court committed two fundamental errors when it granted ITT's motion. First, the Court ignored the allegedly profound differences between this case and *Graves*. Second, the Court did not apply binding Seventh Circuit precedent, specifically *United States ex rel. Baltazar v. Warden*, 635 F.3d 866 (7th Cir. 2011), which set out a "notice of fraud standard" that applies "to the public disclosure issue." (*See* Dkt. 267 at 16-17).

As an initial matter, the Court noted that Leveski's motion was little more than a "second bite at the apple." Not only did it make new arguments, it also took old arguments and repackaged them in a different form. The Court recognized that it would have been within its

14

discretion to deny Leveski's motion summarily. *See Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (a motion for reconsideration is "not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion") (citations omitted).

But, for the sake of thoroughness, this Court addressed Leveski's arguments in detail. First, the Court found that the present allegations were based upon the public disclosure that occurred with the filing of *Graves* because the allegations in the two cases are substantially similar. Therefore, "the allegations at the heart of [Leveski's] lawsuit were publicly disclosed by the time her complaint was filed," and *Graves* was more than adequate to put the United States on notice of the likelihood that fraudulent activity may "be afoot" at ITT. *See Glaser*, 570 F.3d at 914. In other words, although the lawsuits involved cosmetically different pay schemes, they were both based upon the same exact fraudulent conduct: the unlawful payment of incentive compensation by ITT to its employees in violation of the incentive compensation provision, which had the effect of breaching the PPA and defrauding the government. As a final part of its *Graves* analysis, the Court clarified why the 2002 promulgation of the "safe harbor" provision— a feature of this case that was not present in *Graves*—is is not a game-changer for purposes of the public disclosure bar. *See* 34 C.F.R. § 668.14(b)(22)(ii)(A) (permitting certain salary adjustments "not based *solely* on the number of students recruited, admitted, enrolled, or awarded financial aid").[5]

Second, the Court described the Seventh Circuit's *Baltazar* decision in detail, finding that Leveski had, to put it charitably, overstated its impact. Specifically, *Baltazar* dealt with whether

---

[5] A new version of this regulation became effective on July 1, 2011. The new version eliminates much of the cited language and bars incentive payments "based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid . . . ."

government reports that chronicled the pervasiveness of fraud in a given industry—"without attributing fraud to particular firms"—were adequate to put the government on notice that a particular entity was committing a particular fraud. *See* 635 F.3d at 868. Ultimately, the Seventh Circuit found that such government reports were inadequate. *Id*. Here, by contrast, *Graves* provided information that ITT (a particular entity) allegedly committed fraud by violating the incentive compensation provision (a particular fraud), thus breaching promises made to the government in the PPA. For these reasons, the Court denied Leveski's Rule 59(e) motion. *See Leveski*, 2012 WL 266943 (S.D. Ind. Jan. 30, 2012). Additional facts are added below as needed.

## II.   DISCUSSION

Two weeks after the Court dismissed this matter, ITT responded by filing a Motion for Attorney's Fees and Sanctions (Dkt. 245). This motion seeks (1) an award of attorney's fees and sanctions totaling $4,700,051.75 to be paid jointly and severally by the various attorneys and firms representing Leveski; and (2) an award of sanctions against Leveski in the amount of $25,000.00. Not surprisingly, Leveski vigorously opposes this motion, with opposition briefing totaling roughly 75 pages.[6]

### A.  Legal Standards

The crux of ITT's motion is that Leveski's *qui tam* suit was obviously improper and never should have been filed, thus warranting attorney's fees and sanctions. As an initial matter, although this Court has found that it lacks subject matter jurisdiction over Leveski's *qui tam* action, the Court still has jurisdiction to consider ITT's motion for sanctions. *See Wojan v. General Motors Corp.*, 851 F.2d 969, 972 (7th Cir. 1988) ("[P]arties to a suit are not shielded

---

[6] Each of the three firms involved wrote a separate response brief. (Dkt. 270, 272, and 273).

from Rule 11 sanctions simply because the court lacks subject matter jurisdiction over the underlying case.").

ITT cites four grounds for an award of attorney's fees and sanctions: (1) 31 U.S.C. § 3730(d)(4), (2) Fed. R. Civ. P. 11, (3) 28 U.S.C. § 1927, and (4) Fed. R. Civ. P. 54(d)(2). All four grounds set out unique standards and are directed to different actors in the litigation process. First, § 3730(d)(4) provides for an award of attorney's fees to a prevailing defendant in a *qui tam* action as follows:

> If the Government does not proceed with the action and the [relator] conducts the action, the court may award to the defendant <u>its reasonable attorneys' fees and expenses</u> if the defendant prevails in the action and the court finds that the claim … was <u>clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment</u>.

31 U.S.C. § 3730(d)(4) (emphasis added). The only available on-point authority suggests that this statute allows the Court to sanction a party, but not an attorney or a law firm. *See Pfingston v. Ronan Engineering Co.*, 284 F.3d 999, 1006 (9th Cir. 2002). Neither the parties nor the court were able to locate Seventh Circuit authority addressing this issue.

Next, Rule 11(b) provides, in relevant part, as follows:

> By presenting to the court a pleading, written motion, or other paper … an attorney … certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it <u>is not being presented for any improper purpose,</u> such as to harass, cause unnecessary delay, <u>or needlessly increase the cost of litigation</u>; [and]
> >
> > (2) the claims, defenses, and other legal contentions are <u>warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law</u>.

Fed. R. Civ. P. 11(b) (emphasis added). Rule 11 allows the Court to sanction "any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). Under 28 U.S.C. § 1927, the Court has authority to order Leveski's counsel to satisfy the award *personally*, providing as follows:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof <u>who so multiplies the proceedings in any case unreasonably and vexatiously</u> may be required by the court <u>to satisfy personally</u> the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927 (emphasis added). This statute allows the Court to sanction an attorney but not a party or a law firm. *Claiborne v. Wisdom*, 414 F.3d 715, 723-24 (7th Cir. 2005). Section 1927's principal purpose is "the deterrence of intentional and unnecessary delay in the proceedings." *Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 899 F.2d 1171, 1177 (Fed. Cir. 1990). Given its punitive nature, however, "28 U.S.C. § 1927 has been strictly construed." *Badillo v. Central Steel & Wire Co.*, 717 F.2d 1160, 1166 (7th Cir. 1983). Finally, Rule 54(d)(2) merely provides that "[a] claim for attorney's fees . . . must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2).

In support of its request for attorney's fees, ITT points to numerous significant events in the case and then argues that it is entitled to all fees incurred from those points until the dismissal of the case. The following chart represents the various fee requests presented by ITT's motion:

| **Date** | **Event** | **Fees Incurred until dismissal on August 8, 2011** |
|---|---|---|
| March 4, 2009 | District judge grants defendant's 12(b)(1) motion in *Schultz* | $4,700,051.75 |

| May 4, 2010 | Matusheski and local counsel apologize after district judge grants 12(b)(1) motion in *Lopez* | $4,559,674.25 |
| March 7, 2011 | After Leveski's deposition, ITT demands that she voluntarily dismiss or it will seek fees/sanctions | $2,633,322.25 |
| May 27, 2011 | New firm joins representation of Leveski | $758,204.00 |

In addition to deterring and punishing Leveski's attorneys, ITT argues that Leveski herself should have some skin in the game because "she was aware that she knew absolutely nothing about illegal conduct at ITT," yet she agreed to be part of this expensive litigation. (Dkt. 246 at 27). For her complicity on this frivolous lawsuit, ITT seeks $25,000.00 as a sanction.

**B.  Is an Award of Attorney's Fees Appropriate?**

ITT argues that, during the course of this litigation, it became obvious that Leveski's lawsuit was destined to fail. Without belaboring the point, the Court finds that the present lawsuit is both frivolous and brought for an improper purpose within the meaning of Rule 11.

Frivolous is defined as "[l]acking a legal basis or legal merit; not serious; not reasonably purposeful." BLACK'S LAW DICTIONARY 303 (3d. pocket ed. 2006). Leveski only has three colorable arguments why this lawsuit is not frivolous. First, this case is so different from *Graves* that *Graves* does not constitute a public disclosure. To the contrary, despite the cosmetically different pay schemes at issue, these cases, for all practical purposes, share uncanny resemblances. Both cases alleged that ITT had unlawfully paid incentive compensation to certain employees, thus breaching the PPA and defrauding the government. These allegations are obviously more than adequate to put the government on notice that ITT was allegedly involved in a fraudulent scheme.

19

Second, Leveski argues that, despite her dearth of firsthand knowledge about some aspects of her lawsuits, she was in fact an original source based on her belief that she was paid exclusively "by the numbers." In other words, Leveski knew the relevant underlying facts, even if she had no clue about the legal import of those facts. To bolster her claim that she qualifies as an original source, Leveski relies on two Seventh Circuit cases. *See United States ex rel. Lusby v. Rolls Royce Corp.*, 570 F.3d 849, 853-54 (7th Cir. 2009) (rejecting argument in context of Rule 9(b) that plaintiff cannot satisfy the particularity requirement because he did not have Rolls-Royce's billing materials; "[w]e don't think it essential for a relator to provide the invoices (and accompanying representations) at the outset of the suit"); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1017-18 (7th Cir. 1999) (ruling that the public disclosure bar did not apply to relator because he had independent knowledge of city's non-compliance with regulations through his own observations of city bus operations; "[t]here is no question that Lamers had 'direct' knowledge of the way GBT was implementing its tripper service."). These cases are easily distinguishable. In both *Lusby* and *Lamers*, the relators independently knew that an entity might be violating the FCA, even if they lacked substantiating documentation. Here, by contrast, Leveski had no idea that ITT may have violated the FCA or that she may have had a plausible lawsuit against her former employer until she was approached and "educated" by Mr. Matusheski. Common sense suggests that Leveski is worlds apart from the type of genuine whistleblower contemplated by the FCA.

Third, and finally, Plaintiff's counsel argue that this action can't be frivolous because Leveski survived a Rule 12(b)(6) motion to dismiss and, more broadly, ITT spent a lot of money defending this action. If this case was so frivolous, they posit, then why did it take ITT so much time and so many resources to have it dismissed? This argument may have some teeth under

20

some circumstances, but not in all cases. As the Seventh Circuit acknowledged in *In re TCI Ltd.*,
769 F.2d 441 (7th Cir. 1985), "[s]ome frivolous cases impose large costs on defendants when
they require counsel to wade through voluminous records or review many cases." *Id.* at 448. That
is the case here, where Leveski's lack of firsthand knowledge could not be demonstrated until
she was deposed. In other words, ITT was required to do some digging before ferreting out the
frivolousness of this case.[7]

Specifically, Plaintiff's counsel asked the Court to adopt a bright-line rule: "substantial
fees preclude a finding that the action is frivolous." (Dkt. 270 at 16). This argument is absurd on
its face. An example easily illustrates this point. A lawyer could easily dream up a very specific
and coherent story of a worldwide price-fixing conspiracy among top players in a huge industry
and file an antitrust lawsuit. In doing so, the lawyer could fabricate specific players, dates, times,
meetings, thus allowing him to survive a motion to dismiss. From there, the charlatan plaintiff
would be entitled to extensive discovery, forcing the defendants to expend tens of millions of
dollars. By Leveski's counsel's reasoning, this action—which was based on a completely false
story—would not be frivolous because it was expensive to defend and the plaintiff survived a
motion to dismiss. As ITT notes, "[a] detailed complaint filled with outright fabrications very
well might survive multiple motions to dismiss because a court must take the plaintiff's
allegations as true when a deciding a Rule 12(b)(6) motion. But that surely does not mean that
Rule 11 or other sanctions would not eventually be available after these allegations are later

---

[7] In some instances, Congress has created a filter to prevent innocent defendants from getting stuck between a rock
and a hard place: either incur stratospheric discovery costs or settle a lawsuit that might lack merit. That is why, for
instance, the Private Securities Litigation Reform Act of 1995 ("PSLRA") contains an automatic stay of discovery
pending the resolution of motions to dismiss. *See Seippel v. Sidley, Austin, Brown & Wood LLP*, 2005 WL 388561,
at *3 (S.D.N.Y. Feb. 17, 2005) ("The PSLRA stay is intended to prevent defendants from being forced to bear the
expense of discovery until after a court has assessed the sufficiency of the complaint."). As this case illustrates,
similar concerns can be found in the realm of the FCA. However, no similar automatic stay exists in these cases.

proven false . . . ." (Dkt. 278 at 18). In short, the Court finds that this lawsuit is frivolous for purposes of Rule 11.

Having determined that this lawsuit is frivolous, the Court easily finds that it was brought for an improper purpose—presumably, to extract a large settlement from ITT, which would otherwise be forced to incur massive legal fees. On this point, the Court simply cannot ignore the genesis of this lawsuit. Matusheski brought this lawsuit after trolling public dockets and using a private investigator to cold-call ex-employees of for-profit educational institutions who had sued their former employer. This is as unethical as it is unseemly. Specifically, Model Rule of Professional Conduct 7.3 prohibits lawyers from soliciting "professional employment from a prospective client when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain." At its core, this was an opportunistic and attorney-driven lawsuit.

In fact, Matusheski's tactics are far worse than the garden-variety "ambulance chasing"— seen in movies and read about in John Grisham novels—that gives many members of the public a negative perception of the legal profession. At least in those scenarios, the lawyer has some guess that the prospective plaintiff may have a viable case—he or she has, after all, suffered some harm. Here, by contrast, Matusheski plucked a prospective plaintiff out of thin air and tried to manufacture a lucrative case. And, given Matusheski's extensive track record (which includes an apology to a federal court in a very similar case), the Court is persuaded that some type of monetary penalty is necessary to deter Matusheski and those attorneys who assist in his schemes from engaging in this type of conduct going forward. (Obviously, a public shaming is inadequate.) In the Court's view, Matusheski's conduct is precisely the type of abusive behavior that Rule 11 contemplates.

It is true, of course, that Rule 11 sanctions are "to be imposed sparingly, as they can have significant impact beyond the merits of the individual case and can affect the reputation and creativity of counsel." *Hartmax Corp. v. Abboud*, 326 F.3d 862, 867 (7th Cir. 2003) (citation and internal quotations omitted). However, if this order has a negative effect on Matusheski's reputation, then that is a problem his own making. And, in the Court's view, something needs to be done to curtail—not encourage—Mr. Matusheski's "creativity."

### C.  What Amount is Appropriate?

As mentioned, ITT has given the Court three dates that potential trigger the award of attorney's fees: (1) March 4, 2009 (the date the district judge granted defendant's 12(b)(1) motion in *Schultz*); (2) May 4, 2010 (the date Matusheski and local counsel apologized after the district judge granted the defendant's 12(b)(1) motion in *Lopez*); and (3) March 7, 2011 (after Leveski's deposition, when ITT warned Plaintiff's counsel that it would seek fees/sanctions if Leveski did not voluntarily dismiss the lawsuit).

According to ITT, *Schultz* and *Lopez* unequivocally clarified that it is inappropriate for an attorney to seek out a plaintiff who has a tenuous grasp of the fundamental premise of her claims to serve as a *qui tam* relator in a lawsuit against a for-profit educational institution. Logically following, these rulings sealed this case's fate, and it was frivolous for Leveski's counsel to continue pursuing her claims after these decisions were issued. The Court agrees that those two cases are similar enough to the present case that, once decided, the die was effectively cast in this case. Moreover, *Schultz* and *Lopez* gave Matusheski unmistakably clear warnings that he was playing with fire by pushing the present case forward.

Specifically, in *Schultz*, on February 4, 2009, the district judge presided over an oral argument on DeVry's Rule 12(b)(1) motion to dismiss. At the argument, the Court expressed

23

concerns regarding Matusheski's recruitment of the relator and raised the specter of sanctions *sua sponte*, stating "if the defendant's allegations are true, if they are established, there could possibly be Rule 11 liability." Complicating matters, Matusheski did not attend the hearing, and local counsel for the relator conceded that he was "a little chagrined to argue the cause before you today without [Matusheski] also participating."  Entertaining the possibility of seeking sanctions, DeVry then sought certain discovery from Matusheski, but he refused to disclose the documents on privilege grounds. DeVry responded with a motion to compel. (Dkt. 246-2) Before the Court could address this issue, however, the parties reached a settlement and DeVry withdrew its motion to compel, thereby mooting the sanctions issue. (Dkt. 246-3).

*Lopez* followed a similar trajectory. There, the district court ruled that the plaintiff was "clearly . . . not the source of the Complaint's allegations that Strayer's representations to the government were false and made with the requisite intent," thus deducing that "the real source of the information in Lopez's Complaint [was] her attorney," Matusheski. *Lopez*, 698 F. Supp. 2d at 638, 644. Because the plaintiff was "an opportunistic litigant" who "add[ed] no value to the government's efforts to combat fraud," the court concluded that Lopez fell "well short" of satisfying her burden of proving that her claims were not barred. *Id.*at 644. In the aftermath of the dismissal, Strayer filed a motion for attorney's fees. In response, Matusheski submitted an apology to the district court, Strayer, and the Department of Justice. In exchange for the apology, Strayer withdrew its motion one week later.

The main distinguishing feature of this case is that, here, the Court relied on an actual case against ITT (i.e. *Graves*)—rather than industry-wide allegations—for purposes of the public disclosure analysis. Notably, that means that ITT's defense here was arguably *stronger* than the defenses in both *Lopez* and *Schultz*. On this point, the United States filed a statement of interest

24

in support of the proposition that the "public disclosure" alleged in *Schultz* and *Lopez* "failed to put the government on notice of the likelihood of Strayer's alleged fraudulent activity"; in doing so, the government stressed "that *Schultz* was incorrectly decided." *See id.* at 642. Importantly, though, such concerns do not exist in the present case. Finally, it is worth again highlighting that, in the aftermath of both *Schultz* and *Lopez*, Matusheski tiptoed around sanctions awards. His decision to proceed with this case in the wake of those rulings was risky, if not ridiculous.

In the end, however, the Court finds that neither the ruling in *Schultz* nor the apology in *Lopez* is the appropriate trigger for attorney's fees. At the time those rulings were issued, the extent of Leveski's knowledge—or lack thereof—had not been aired out. That is why, in the Court's view, the better trigger date is March 7, 2011—after Leveski's deposition, which confirmed that this case tracked Matusheski's *modus operandi* of recruiting know-nothing plaintiffs. On this date, ITT offered a grand bargain (or, perhaps more accurately, a "get out of jail free card") in which it agreed not to seek attorney's fees and sanctions if Leveski voluntarily dismissed the lawsuit. From there, counsel exchanged numerous letters discussing this option, but these communications were futile. In fact, from these letters, it appears that Plaintiff's counsel went to great lengths *not* to understand ITT's request; ITT's counsel likened responding to the communications to being trapped in an "Abbott and Costello routine." To quote the Russian novelist Leo Tolstoy:

> The most difficult subjects can be explained to the most slow-witted man if he has not formed any idea of them already; but the simplest thing cannot be made clear to the most intelligent man if he is firmly persuaded that he knows already, without a shadow of doubt, what is laid before him.

In short, the Court finds March 7, 2011 to be the appropriate trigger date for attorney's fees. ITT has produced evidence that, since that date, it has incurred $2,633,322.25 in legal expenses.

For two reasons, however, the Court will exercise its discretion and not award this amount in full. First, from the outset of this litigation, ITT's counsel surely had some inkling that Ms. Leveski might not be an original source. Therefore, ITT's counsel should not have waited over three years into the litigation to depose her. If they made Leveski's deposition a top priority, they could have filed a Rule 12(b)(1) motion earlier, and their client's fees would have been much smaller. *See Dubisky v. Owens*, 849 F.2d 1034, 1037 (7th Cir. 1988) ("the court must consider to what extent a defending party's injury could have been avoided or was self-inflicted," which entails "an examination of the promptness and method of bringing the frivolous conduct to the attention of both the court and the opposing party"). Second, the Court is mindful that, despite the fact Matusheski has tempted fate with attorney's fee awards in the past, no judge has ever actually issued a similar award against him. Although this Court is not hesitant to be the first, some restraint is warranted under the circumstances. *See* Fed. R. Civ. P. 11(c)(4) ("A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated.").

In light of these considerations, the Court finds that 15 percent of the amount of attorney's fees actually spent from March 7, 2011 onward is an appropriate figure. Thus, the Court awards attorney's fees in the amount of $394,998.33. Given this significant markdown from what ITT is requesting, the Court need not address in detail the reasonableness of ITT's counsel's fees. No one could seriously argue that, given the sheer volume of legal work that has been done in this case, $394,998.33 is an unreasonable amount. On a related note, Leveski's related Motion to Strike or Disregard Declaration" of ITT's counsel (Dkt. 268) is **DENIED**.

Finally, the Court must determine *who* will be subject to this award. The Court will issue this award against Timothy Matusheski personally and his law firm, The Law Offices of

26

Timothy J. Matusheski. With respect to Mr. Matusheski individually, the Court finds that he has

unreasonably multiplied the proceedings and that his conduct has been vexatious under 28

U.S.C. § 1927, which is marked by intentional bad faith or at least recklessness with respect to

the law. *See Ordower v. Feldman*, 826 F.2d 1569, 1574 (7th Cir. 1987) ("A lawyer's reckless

indifference to the law may impose substantial costs on the adverse party. Section 1927 permits a

court to insist that the attorney bear the cost of his own lack of care."); *In re TCI Ltd.*, 769 F.2d

at 450 ("Litigation must be grounded in an objectively reasonable view of the facts and the law.

If it is not, the lawyer who proceeds recklessly—not his innocent adversaries—must foot the

bill."). Additionally, the Court will issue this award against the law firms of Plews Shadley

Racher & Braun (which joined this litigation on April 30, 2009) and Motley Rice LLP (who

unfortunately joined this litigation on May 27, 2011), given their intimate involvement with this

case. However, because the Court is not familiar with the extent of each attorney's knowledge of

and involvement with this case, it will not issue this award against any of the individual attorneys

at those two firms. In sum, these three law firms and Timothy Matusheski individually will be

jointly and severally liable for $394,998.33.[8]

### D.  Are Sanctions against Leveski Appropriate?

Leveski agreed to be a pawn in an expensive game of litigation. For this conduct, ITT

asks the Court to sanction Leveski in an amount of $25,000.00. Indeed, prior to being

---

[8] ITT met the Rule 11 safe harbor for both Plews Shadley Racher & Braun and The Law Offices of Timothy J. Matusheski  by notifying them on numerous occasions that ITT would seek fees and expenses if Leveski's claims were not voluntarily dismissed. (*See* Dkt. 246 at 14-17). As for Motley Rice LLP—which had not yet appeared in this case when ITT issued its safe harbor warnings—the Court finds that it has discretion to impose this sanction using the inherent power of the court. As the Seventh Circuit has noted, "the court retains inherent power to impose sanctions when the situation is grave enough to call for them and the misconduct has somehow slipped between the cracks of the statutes and rules covering the usual situations." *Claiborne v. Wisdom*, 414 F.3d 715, 724 (7th Cir. 2005). The Court finds that this is one such rare instance. Notably, here, Motley Rice attorneys actually participated in the oral arguments on ITT's 12(b)(1) motion on June 2, 2011. (Dkt. 185). It cannot be seriously argued that they are somehow detached from the relevant course of events or that one-fourth of the 15% award is unreasonable.

approached by Matusheski, Leveski was blissfully ignorant of the crux of her lawsuit: that ITT allegedly violated the law. But, prior to determining whether to embark on this lawsuit, Leveski undoubtedly considered its potential costs and benefits. And, hopefully apprised of the risks of such litigation, Leveski ultimately determined that it was worth pursuing. This calculation was in error and is not without consequence.

However, in the end, the Court will not level sanctions against Leveski because (although not the subject of the present motion) it is inclined to grant certain portions—though not all—of ITT's Bill of Costs submission (Dkt. 244). *See* Fed. R. Civ. P. 54(d)(1) (costs "should be allowed to the prevailing party," unless "a federal statute, these rules, or a court order provides otherwise."); *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 945 (7th Cir. 1997) (the strong presumption "in favor of awarding costs to the prevailing party is difficult to overcome, and the district court's discretion is narrowly confined—the court must award costs unless it states good reasons for denying them"). In short, the Bill of Costs will be punishment enough for Leveski, who is in dire financial straits.

This Bill of Costs ruling will be issued in due course. For now, however, it is worth noting that the Court is not persuaded by Leveski's two arguments why the Court should *flatly* deny ITT's Bill of Costs. First, Leveski contends that awarding costs is inappropriate in *qui tam* matters because relators pursue lawsuits on behalf of the United States, and a contrary ruling would have a chilling effect on would-be relators seeking to root out fraud. However, Leveski does not cite any meaningful authority for this proposition. Instead, she premises her argument on the fact that, unlike § 3730(d)(1) and (2), § 3730(d)(4) does not explicitly allow a *qui tam* defendant to recover its *costs*. This argument has some appeal, but the Court is not persuaded. This argument ignores the language of Rule 54(d)(1), which provides that costs *should* be issued

28

as a *default*, unless a rule, statute, or order says otherwise. Presumably, Congress knew the "opt-out" nature of Rule 54(d)(1) when crafting § 3730(d)(4); if they were going to remove costs from the equation when the relator is litigating alone, they needed to do it *explicitly*, not through *silence*. Other rulings—including Seventh Circuit precedent—reinforce this position. *See Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 734 (7th Cir. 1999) (finding taxation of costs appropriate where the *qui tam* relator's claim did not survive summary judgment); *United States ex rel. Costner v. United States*, 317 F.3d 889, 890-91 (8th Cir. 2003) ("§ 3730(d)(4) is not an express provision regarding costs and thus does not displace the district court's authority to award costs under Rule 54."); *United States ex rel. Crenshaw v. Degayner*, 2009 WL111673, at *2 (M.D. Fla. Jan. 15, 2009) (finding that there were no express provisions in the FCA that would preclude an award of costs and noting that the "clear weight of authority" supported this finding).

Next, Leveski contends that ITT should not recover its costs because she is indigent. Indeed, Seventh Circuit precedent suggests that the Court has some discretion in this area: "Generally, only misconduct by the prevailing party worthy of a penalty *or the losing party's inability to pay* will suffice to justify denying costs." *Weeks*, 126 F.3d at 945 (emphasis added); *Badillo*, 717 F.2d at 1165 (the presumption of awarding costs to the prevailing party "may be overcome by a showing of indigency" but this is an issue "within the discretion of the district court"). Leveski has adduced considerable evidence establishing her precarious financial state and her inability to pay.

Importantly, though, "[a] Plaintiff's indigency . . . does not require the court to automatically waive costs to an unsuccessful litigant." *McGill v. Faulkner*, 18 F.3d 456, 459 (7th Cir. 1994). Specifically, in *McGill*, the plaintiff argued that the district court's award of costs to

the defendants was improper because the plaintiff was indigent and award of costs would have a "chilling effect" on civil rights litigation. *Id*. at 460. The Seventh Circuit rejected this argument, stating that "far from 'chilling' prisoners' litigation, the rule that indigent prisoners, like anybody else, may be required to reimburse costs others have expended defending the prisoners' unsuccessful suits serves the valuable purposes of discouraging unmeritorious claims and treating all unsuccessful litigants alike." *Id*. Along these same lines, the Seventh Circuit observed that "[n]on-indigents who contemplate litigation are routinely forced to decide whether their claim is 'worth it' . . . . We see no reason to treat indigents differently in this respect." *Id*. (citation omitted).

That reasoning applies with particular force here. Employing its discretion, the Court finds that some award of costs will be appropriate. Agreeing to be part of this case was a highly irresponsible move on Leveski's part; she knew that her lawsuit-related knowledge was paltry at best. Her common sense simply had to tell her that "if something is too good to be true, it probably is." Nonetheless, she decided to sue ITT. Now, the Court has ruled that Leveski is an "unsuccessful litigant," and Rule 54(d) creates clear consequences for unsuccessful litigants. In the Court's view, the presumption articulated in Rule 54(d) should apply, notwithstanding Leveski's sympathetic financial condition. *See Luckey*, 183 F.3d at 734 ("Straitened circumstances do not justify filing weak suits and then demanding that someone else pay the bill."). "Someone has to bear the costs of litigation, and the winner has the much better claim to be spared them—not just a morally or economically better claim, but under Rule 54(d) a legally better claim." *Id*. In sum, because the Court has resolved to grant portions of ITT's Bill of Costs submission, it will not pile on with an additional sanction of $25,000.00 against Ms. Leveski.

### III.     CONCLUSION

For the reasons set forth above, ITT's Motion for Attorney's Fees and Sanctions (Dkt.

245) is **GRANTED** with respect to attorney's fees in the amount of $394,998.33, but **DENIED**

with respect to sanctions against Leveski. The attorney's fee award is issued jointly and severally

against Timothy J. Matusheski individually, The Law Offices of Timothy J. Matusheski, the law

firm of Plews Shadley Racher & Braun, and the law firm of Motley Rice LLP. Leveski's related

Motion to Strike or Disregard Declaration" of ITT's counsel (Dkt. 268) is **DENIED**. The Court

will issue a ruling on ITT's Bill of Costs submission (Dkt. 244) in due course.

SO ORDERED.    03/26/2012

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

31

Distribution to:

**Kristopher P. Diulio**
GIBSON DUNN & CRUTCHER LLP
kdiulio@gibsondunn.com,gross@gibsondunn.com

**Frederick D. Emhardt**
PLEWS SHADLEY RACHER & BRAUN
emhardt@psrb.com,akeaton@psrb.com

**Nicola T. Hanna**
GIBSON DUNN & CRUTCHER LLP
NHanna@gibsondunn.com,TStephens@gibsondunn.com

**Timothy John Hatch**
GIBSON DUNN & CRUTCHER LLP
thatch@gibsondunn.com

**Sean M. Hirschten**
PLEWS SHADLEY RACHER & BRAUN
shirschten@psrb.com

**John M. Ketcham**
PLEWS SHADLEY RACHER & BRAUN
jketcham@psrb.com

**Mark I. Labaton**
MOTLEY RICE LLP
mlabaton@motleyrice.com

**Timothy J. Matusheski**
LAW OFFICES OF TIMOTHY J.
MATUSHESKI
tim@mississippiwhistleblower.com

**Brianna J. Schroeder**
PLEWS SHADLEY RACHER & BRAUN
bschroeder@psrb.com

**Wayne W. Smith**
GIBSON DUNN & CRUTCHER, LLP
wsmith@gibsondunn.com

**Philip A. Whistler**
ICE MILLER LLP
philip.whistler@icemiller.com

**Shelese M. Woods**
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov

**Robert M. Zabb**
MOTLEY RICE LLP
rzabb@motleyrice.com

**James L. Zelenay , Jr**
GIBSON DUNN & CRUTCHER LLP
jzelenay@gibsondunn.com